AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address):* | ) | Case No.  24-SW-244 |
| ONE CELLPHONE AND ONE TABLET | ) | |
| COMPUTER LOCATED IN WASHINGTON, | ) | |
| D.C., UNDER RULE 41 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A-1 and A-2 (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2119(1) (carjacking) ; 18 U.S.C. § 2313 (sale or receipt of stolen vehicles);  18 U.S.C. 924(c)(1)(A)(ii) (using, possessing, carrying, and brandishing a firearm during and in relation to a crime of violence);  18 U.S.C. § 922(g)(1) (unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year);  18 U.S.C. § 933 (trafficking in firearms) . | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Darius J. Terry, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:   8/2/2024
_____

_____
*Judge's signature*

City and state:   Washington, D.C.
_____

Zia M. Faruqui
_____
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* ONE CELLPHONE AND ONE TABLET COMPUTER LOCATED IN WASHINGTON, D.C., UNDER RULE 41 | ) ) ) ) ) ) ) Case No. 24-SW-244 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia. *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2 (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____August 15, 2024_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____8/2/2024_____          _____

*Judge's signature*

City and state:   _____Washington, D.C._____          Zia M. Faruqui

United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>24-SW-244 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

                                                                    _____
                                                                        *Executing officer's signature*

                                                                    _____
                                                                        *Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched, which is depicted below, is a blue Apple iPhone cellphone with damage to its front and rear glass that is currently stored by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) as ATF Exhibit #01 ("TARGET DEVICE–1").   TARGET DEVICE–1 is currently located at the ATF's Washington Field Division, 90 K Street Northeast, Washington, D.C. 20002.



## ATTACHMENT A-2

**Property to Be Searched**

The property to be searched, which is depicted below, is a black Amazon Fire tablet computer that is currently stored by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) as ATF Exhibit #02 ("TARGET DEVICE–2").  TARGET DEVICE–2 is currently located at the ATF's Washington Field Division, 90 K Street Northeast, Washington, D.C. 20002.



**ATTACHMENT B**

**Property to Be Seized**

The items, information, and data to be seized from TARGET DEVICE–1 and TARGET DEVICE–2 (collectively, the "TARGET DEVICES"), the items identified in Attachments A-1 and A-2 are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 2119(1) (carjacking); 18 U.S.C. § 2313 (sale or receipt of stolen vehicles); 18 U.S.C. 924(c)(1)(A)(ii) (using, possessing, carrying, and brandishing a firearm during and in relation to a crime of violence); 18 U.S.C. § 922(g)(1) (unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year); 18 U.S.C. § 933 (trafficking in firearms) (collectively, the "TARGET OFFENSES") that have been committed by RASHEED JENKINS and other unidentified persons (the "SUBJECTS"), as described in the search warrant affidavit, including, but not limited to, call logs, phone books, voicemail messages, text messages, photographs, images and videos, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

    a. the ownership and use of the TARGET DEVICES;

    b. the commission of the TARGET OFFENSES;

    c. locations where the SUBJECTS committed the TARGET OFFENSES or traveled to before, in preparation for, and after the commission of the TARGET OFFENSES;

    d. meetings and communications between the SUBJECTS and other individuals discussing the planning, commission, or other conduct related to the TARGET OFFENSES, including information constituting the evidence of the state of mind

of any co-conspirators or collaborators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the TARGET OFFENSES;

e.   communications between the SUBJECTS and other individuals who may have assisted or provided support (knowingly or unknowingly) in the commission of one or more of the TARGET OFFENSES, including information that helps reveal their identities or whereabouts;

f.   the SUBJECTS' acquisition, possession, concealment, sale, transfer, expenditure, or use of any evidence, contraband, fruits, or other items related to the commission of the TARGET OFFENSES, including but not limited to firearms, ammunition, and firearms paraphernalia, as well as such person's connection to the location where such evidence or other items were acquired, possessed, concealed, sold, transferred, expended, used, or ultimately recovered by law enforcement;

g.   the SUBJECTS' access to, purchase of, sale of, possession of, transportation of, or relationship with, stolen motor vehicles;

h.   the SUBJECTS' access to, acquisition of, or possession of any firearms, ammunition, or firearms paraphernalia;

i.   the email addresses, phone numbers, and social media account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the commission of the TARGET OFFENSES;

j.   who used, owned, or controlled the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing

2

history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

k.  software, or the lack thereof, that would allow others to control the TARGET DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.  attachment to the TARGET DEVICES of other storage devices or similar containers for electronic evidence;

m.  counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICES;

n.  the times the TARGET DEVICES were used;

o.  passwords, encryption keys, and other access to the TARGET DEVICES that may be necessary to access the TARGET DEVICES;

p.  documentation and manuals that may be necessary to access the TARGET DEVICES or to conduct a forensic examination of the TARGET DEVICES;

q.  records of or information about the Internet Protocol addresses used by the TARGET DEVICES; and

r.  records of or information about the TARGET DEVICES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE CELLPHONE AND ONE TABLET COMPUTER LOCATED IN WASHINGTON, D.C., UNDER RULE 41** | **No. 24-SW-244** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Darius J. Terry of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AFFIANT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, specifically two digital devices: a blue Apple iPhone cellphone with damage to its front and rear glass ("TARGET DEVICE–1"), as further described below and in Attachment A-1; and a black Amazon Fire tablet computer, as further described below and in Attachment A-2 ("TARGET DEVICE–2") (collectively, the "TARGET DEVICES"), for the things described in Attachment B.

2.      I, Darius J. Terry, have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since July 2023. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Specifically, I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since July of 2023. I am presently assigned to the Washington D.C. Field Office. I am a graduate of the Criminal Investigator Training Program at the Federal

Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy. My training at the academy included formalized instruction in, among other things, drugs, firearms, violent crime-related investigations, drug identification and detection, interdiction, familiarization with United States drug and firearms laws, financial investigations and money laundering, identification and seizure of drug and firearms tracking related assets, physical and electronic surveillance, weapon qualification and tactics, operation and use of confidential informants, and undercover operations.

3.      As an ATF Special Agent, I have participated in federal investigations involving the distribution of controlled substances, theft, and robbery. I have participated in physical surveillance operations and in the execution of federal search warrants, including those involving multi-state criminal activity.

4.      Before joining the ATF, I was a law enforcement officer for the Virginia State Police (VSP) from June 2011 to July 2023.  From April 2017 to July 2023, I worked narcotics investigations.  Your affiant has participated in numerous narcotic arrests and has drafted affidavits in support of search warrants that have led to the arrest of numerous defendants and the recovery of crucial evidence.  Your affiant has also received on-the-job training in the areas of drugs and narcotics enforcement.

5.      I have been personally involved in the investigation of this matter.  I am familiar with the information contained in this Affidavit based on my participation in the investigation, my review of documents and other evidence, my conversations with other law enforcement officers, and my training and experience.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included the details of every aspect of the investigation.  Where actions, conversations, and statements of others are related

herein, they are related in substance and in part, except where otherwise indicated.

6.     Based on my training and experience, in addition to the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that evidence relating to violations of 18 U.S.C. § 2119(1) (carjacking); 18 U.S.C. § 2313 (sale or receipt of stolen vehicles); 18 U.S.C. 924(c)(1)(A)(ii) (using, possessing, carrying, and brandishing a firearm during and in relation to a crime of violence); 18 U.S.C. § 922(g)(1) (unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year); 18 U.S.C. § 933 (trafficking in firearms) (collectively, the "TARGET OFFENSES") that have been committed by RASHEED JENKINS and other unidentified persons (the "SUBJECTS"), including the things described in Attachment B. will be discovered during a search of the TARGET DEVICES, the items described in Attachments A-1 and A-2.

## IDENTIFCATION OF THE DEVICES TO BE EXAMINED

7.     TARGET DEVICE–1 is a blue Apple iPhone cellphone with damage to its front and rear glass, associated with ATF Exhibit #01, as described and depicted in Attachment A-1. TARGET DEVICE–1 was seized on July 3, 2024, from the kitchen of the apartment in which JENKINS was arrested, as set forth in further detail below.

8.     TARGET DEVICE–2 is a black Amazon Fire tablet computer, associated with ATF Exhibit #02, as described and depicted in Attachment A-2.  TARGET DEVICE–2 was seized on July 3, 2024, from the living room of the apartment in which JENKINS was arrested, as set forth in further detail below.

9.     The TARGET DEVICES are currently stored as evidence by ATF at its Washington Field Division, 90 K Street Northeast, Washington, D.C. 20002.

3

## PROBABLE CAUSE

10.     As set forth below, there is probable cause to believe that JENKINS committed armed carjackings on August 25, 2023, and January 26, 2024, using firearms that he was legally prohibited from possessing.  On February 2, 2024, JENKINS was arrested in the District of Columbia driving a BMW that he took in a January 26, 2024, armed carjacking.  A loaded handgun was found on the rear passenger floorboard of that vehicle, within arm's reach of the driver's seat. On February 29, 2024, a Federal grand jury empaneled by the U.S. District Court for the District of Columbia returned a one-count indictment charging JENKINS with one count of violating 18 U.S.C. § 922(g)(1) for the firearm recovered on February 2, 2024, and an arrest warrant was issued. JENKINS was arrested pursuant to that warrant on July 3, 2024.  This warrant application pertains to digital devices seized from the apartment unit in which JENKINS was arrested at the time of his arrest.  (A Federal grand jury recently returned a superseding indictment charging JENKINS with the August 25, 2023, and January 26, 2024, carjackings, and related firearms offenses, as explained below.)

### *The August 25, 2023, Armed Carjacking*

11.     On Friday August 25, 2023, at approximately 11:35 p.m., the Metropolitan Police Department responded to 3504 Minnesota Ave Southeast, Washington, D.C., for the report of an armed carjacking.

12.     The victim of the carjacking ("VICTIM–1") reported that he was a Special Police Officer who had just finished working for the evening.  He drove his car, a black Dodge Charger with D.C. tag GK6262 and VIN 2C3CDXGJXJH210468, into the parking lot adjacent to 3504 Minnesota Ave Southeast, parked his vehicle, and began walking towards the door of his building.

13.     When VICTIM–1 entered the breezeway between the parking lot and the front door

4

of his building, he was confronted by an armed suspect who was pointing a firearm at him. The suspect ordered VICTIM–1 to give him everything and to give him his wallet. VICTIM–1 complied with the suspect's demands and threw his keys and his wallet on the ground. The suspect then told VICTIM–1 to run towards his residence, and VICTIM–1 complied.

14.     As VICTIM–1 headed towards his residence, he heard his vehicle start and be driven away. VICTIM–1was unable to see which direction the vehicle fled out of the parking lot.

15.     Inside the wallet that the suspect took was VICTIM–1's Navy Federal Credit Union credit card, D.C. driver's license, as well as other personal items. VICTIM–1's ballistic vest and SPO badge were inside his vehicle when it was stolen. VICTIM–1 works as an armed SPO, but his firearm was not inside his vehicle at the time of the carjacking because VICTIM–1 leaves his firearm at work. VICTIM–1 stated that he sometimes carries a concealed firearm but was not carrying a firearm that evening.[1]

16.     VICTIM–1 described the suspect as a black male, possibly fifteen years of age, with a short, thin stature about 120 pounds. VICTIM–1 said that the suspect was wearing a black hoodie, black pants, and black shoes. VICTIM–1 said that the suspect had a black ski mask on during the offense so he could not provide additional information about what the suspect looked like. VICTIM–1 described the firearm as a 9-millimeter handgun.

17.     At approximately 11:37 p.m., VICTIM–1's vehicle was detected by the License Plate Reader located at the corner of East Capitol Street and Texas Avenue Southeast, which is approximately a four-minute drive from VICTIM–1's residence, where the carjacking occurred.

18.     At approximately 1:00 a.m., MPD's helicopter, Falcon 1, responded to the 7th

---

[1] In his 911 call, it sounds as though VICTIM–1 initially states that his car and gun were stolen. However, VICTIM–1 clarified to responding officers that he did not have a gun on him that evening and only the perpetrator had a gun.

District to canvass for the black Dodge Charger.  While the Crew of Falcon 1 was canvassing, they noticed a black Dodge Charger at the intersection of Stanton Road and Savannah Street Southeast. Falcon 1 illuminated the vehicle with its spotlight, and the vehicle took off at a high rate of speed. The Dodge Charger broke several traffic laws as it traveled through the 7th, 6th, 1st and 3rd Districts.  Falcon 1 announced that the vehicle began to fishtail in the area of 14th and Swann Streets Northwest.   The vehicle then stopped at the intersection of 15th and Swann Streets Northwest.  At approximately 1:28 a.m., the Falcon 1 officer noticed that the driver side door was open but did not see the suspect bail from the vehicle.   The officer could not see any suspects due to the tree cover but voiced that the suspects had not run west or south from the bailout location.

19.    MPD arrived at the intersection and observed VICTIM–1's vehicle not moving, unoccupied, with only the driver's door open, as depicted below.  The vehicle was still in "drive," and MPD had to put the car in park.  MPD set a perimeter and began canvassing for suspects.



20.    Less than ten minutes after the bailout, at approximately 1:36 a.m., MPD received

6

a 911 call about a suspicious person running down Swann Street Northwest and hiding underneath the steps of 1416 Swann Street Northwest.  MPD responded to that location and found JENKINS hiding underneath the steps at 1416 Swann Street Northwest between a wall and the gas meter, as depicted below.  JENKINS was observed to be excessively sweating, and he told officers that he was under the influence of PCP.  Officers called an ambulance and seated JENKINS on the steps of 1416 Swann Street Northwest.



21.     While waiting for an ambulance, MPD officers started canvassing the area where JENKINS was apprehended.   At approximately 1:57 a.m., while JENKINS was still sitting on the front steps of 1416 Swann Street Northwest, Investigator Choi found a black firearm inside the mailbox of the bottom apartment of 1416 Swann Street Northwest, in the same area where JENKINS was found hiding. The below still image from body-worn camera shows JENKINS on the left, while officers are trying to detain him, and the mailbox from which the firearm was

eventually recovered on the right, circled in red.



22.     The recovered firearm was a black 9-millimeter semi-automatic Smith & Wesson, model M&P9 Shield semi-automatic firearm bearing serial number HYX5676.  The firearm was loaded with one chambered round and 8 rounds in its magazine.  Below, the still image from body-worn camera on the left shows the firearm being recovered out of the mailbox, circled in red, and the photo on the right shows the firearm after its recovery.



23.     Inside VICTIM–1's vehicle, MPD found VICTIM–'s wallet and his Dodge Charger key fob, but his ballistic vest and his house keys were missing.  Located outside of VICTIM–1's

vehicle, east of 15th Street Northwest, on Swann Street Northwest, in JENKINS's presumed flight path, was a dark colored mask, a cellphone, and a set of keys belonging to a Honda (not VICTIM–1's vehicle).  Another cellphone was found on JENKINS when he was searched incident to arrest.

24.     JENKINS was placed under arrest, but the matter was referred for further investigation.

25.     Law enforcement subsequently obtained historical cell site location information for the phone number associated with the device that was recovered from JENKINS' person on August 26, 2023.  That data puts JENKINS' device near scene of the carjacking, along the Charger's observed flight path, and near the 1400 block of Swann Street Northwest, where it was ultimately recovered from JENKINS' person.

26.     DNA swabs from the recovered firearm, its magazine, and JENKINS were sent to the FBI Laboratory for testing and analysis.  The FBI issued an April 18, 2024, report.  Male DNA was obtained from the firearm and was interpreted to have originated from two individuals.  The DNA results from the firearm are 270 octillion times more likely if JENKINS and an unknown, unrelated person are contributors than if two unknown, unrelated people are contributors.  Male DNA was obtained from the magazine and was interpreted to have originated from three individuals.  The DNA results from item 2 are 10 octillion times more likely if JENKINS and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors.

### *The January 26, 2024, Armed Carjacking*

27.     On January 26, 2024, at approximately 3:33 a.m., Prince George's County Police responded to 5909 Old Central Avenue in Capitol Heights, Maryland, for a report of an armed carjacking. VICTIM–2 stated that she was exiting a 24-hour convenience store when an armed

suspect exited a vehicle, approached her, and demanded her vehicle keys while pointing a black long gun at her. The suspect reportedly said, "Shut up or I will kill you." VICTIM–2 said she feared for her life, so she handed the suspect her keys. The suspect fled in VICTIM–2's vehicle towards Washington, D.C., while a second suspect followed behind in the vehicle from which the armed suspect had emerged. VICTIM–2 described the suspect vehicle as a gray sedan with white spray paint and tinted windows. VICTIM–2 described the armed suspect as a Black male, approximately 18 years old, 145 pounds, wearing a black mask and a black or dark gray long coat with a white fur hood.

28.     VICTIM–2's vehicle is a blue 2014 BMW 328i bearing Virginia registration TNF2184 and VIN WBA3A5G5XENP33477. VICTIM–2 reported that the vehicle belonged to her boyfriend.

29.     One week later, on February 2, 2024, Prince George's County area law enforcement received a License Plate Reader alert for VICTIM–2's vehicle. At approximately 12:56 p.m., officers from the Prince George's County and the Forest Heights Police Departments observed VICTIM–2's car at the Burger King located at 5141 Indian Head Highway in Oxon Hill, Maryland. Officers activated their emergency equipment and attempted to stop the car, but the vehicle fled.

30.     Officers pursued the vehicle for approximately twelve minutes as it merged onto Interstate 295 northbound, then merged onto Interstate 695 westbound, and eventually exited Intestate 695 at 8th Street Southeast. VICTIM–2's vehicle made multiple U-turns, drove up on a curb, and then fled westbound on I Street Southeast from 8th Street Southeast. At approximately 1:06 p.m., the driver—the sole occupant of the vehicle—bailed out just east of 9th and I Streets Southeast, as depicted in the below still-image from dashcam video. The suspect was driving the wrong way on a one-way street when he bailed out.



31.     After a brief foot pursuit, the suspect was apprehended and identified himself as JENKINS.  Officers had eyes on VICTIM–2's vehicle during the entire pursuit.  They also had eyes on JENKINS from the moment he bailed out of the vehicle until the moment he was apprehended.  JENKINS was the only individual that was inside of VICTIM–2's vehicle during and after the pursuit.

32.     Officers searched the vehicle.  On the rear passenger side floorboard, in plain view and within arm's reach of the driver's seat, was a .45 caliber Glock 30 Gen4 semi-automatic firearm bearing serial number YEM949.  The firearm was loaded with one chambered round and 9 rounds in its 13-round magazine.  Officers also found VICTIM–2's debit card in the driver's seat of the vehicle.  The below photo depicts the firearm, circled in red.



33.     Officers searched JENKINS's flight path after he bailed out of the vehicle and found a black iPhone with a Nike case.  JENKINS confirmed with officers that the phone belonged to him.

34.     JENKINS was on scene for approximately one hour while the three different law enforcement agencies were working out who would be collecting what evidence.  During this time, JENKINS was very concerned about getting his girlfriend's phone number out of his phone, and officers accommodated his request.  JENKINS complained about being short of breath, said he had asthma and bad bronchitis, and vomited a little on the street.  He told officers on scene that he knew the car was stolen but that he just bought the car one hour before and he didn't know there was a gun in the car.  Officers asked Jenkins how much he had paid for the car, and he told officers that he bought the car for $100.  (Later, in the cell block, Jenkins asked to speak with a detective. After receiving Miranda warnings and waiving his rights, he told the detective he bought the car for $250.)

35.    JENKINS was placed under arrest, but the matter was referred for further investigation.

36.    The phone recovered on February 2, 2024, was determined to be associated with the same telephone number as the phone recovered from JENKINS' person incident to his August 26, 2023, arrest.  Law enforcement subsequently obtained historical cell site location information for the phone number.  That data puts JENKINS' device near the scene of the carjacking.

37.    DNA swabs from the recovered firearm, its magazine, and JENKINS were sent to the FBI Laboratory for testing and analysis.  The FBI issued an April 18, 2024, report.  Male DNA was obtained from the firearm and was interpreted to have originated from four individuals.  The DNA results from the firearm are 11 septillion times more likely if JENKINS and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors.  Male and female DNA was obtained from the magazine.  The DNA results from the magazine are 380 million times more likely if JENKINS and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors.

38.    On February 29, 2024, a Federal grand jury empaneled by the U.S. District Court for the District of Columbia returned a one-count indictment charging JENKINS with a violation of 18 U.S.C. § 922(g)(1) for the firearm recovered on February 2, 2024.  Federal law prohibits JENKINS from possessing a firearm because he has been convicted of crimes punishable by imprisonment for a term exceeding one year.  Specifically, the defendant was previously convicted of attempted robbery in the Superior Court of the District of Columbia, case number 2015 CF3 004091, and of motor vehicle theft and carrying a loaded firearm in the Circuit Court for Prince George's County, Maryland, case number CT210215X, all of which are crimes punishable by

more than one year of imprisonment.  Following the grand jury's return of an indictment, an arrest warrant was issued.

### *JENKINS' July 3, 2024, Arrest*

39.     On July 3, 2024, MPD and the U.S. Marshals Service (USMS) conducted a joint operation at 7150 12th Street Northwest to apprehend JENKINS.  Officers were advised that JENKINS had ties to a particular unit in the apartment building located at that address.  Once on scene, at around 4:00 p.m., officers spoke with property management and produced a current photo of JENKINS.  Property management advised that JENKINS frequents the building and had just entered the building around 3:50 p.m.  Officers asked to see CCTV footage from the time property management observed JENKINS entering the front building and were able to verify that JENKINS had entered the building.

40.     Law enforcement also spoke with WITNESS–1, the leaseholder of the apartment unit, who has known JENKINS for approximately one month.  WITNESS–1 advised that JENKINS had been in her apartment earlier that morning but that she had been at work all day and did not know if he was still there.  WITNESS–1 provided consent for law enforcement to search the residence for JENKINS.

41.     MPD set a perimeter around the building while USMS entered the apartment with a key fob provided by the apartment building.  USMS did not locate JENKINS inside.

42.     At approximately 9:30 p.m., MPD was dispatched to 7150 12th Street Northwest for the report of a man in a stairwell.  Access to the building's residential hallways from the stairwells is restricted to individuals with a key fob.  A resident reported that a man was in the stairwell asking to be let into the hallway.  The stairwell door from which the man was attempting to access the hallway is situated directly across from the door to the apartment unit associated with

JENKINS.  Given the surrounding circumstances, officers believed that the individual could be JENKINS.  MPD and USMS returned to the scene.  WITNESS–1 exited her apartment unit and told an MPD officer stationed in the hallway that she was leaving and that JENKINS was inside the apartment.

43.    While securing the building, law enforcement located an abandoned bookbag inside the stairwell in which the individual believed to have been JENKINS was reportedly observed. Two firearms were found inside the bookbag.  A crime scene technician from the D.C. Department of Forensic Sciences responded to the scene to recover the firearms.  The firearms, which are depicted below, were determined to be (i) a 9x19-millimeter Century Arms Draco with 28 rounds in its 31-round magazine and one loose round of ammunition and (ii) a 9x19-millimeter Taurus G3 with 8 rounds in its 10-round magazine.  The Taurus firearm had been reported stolen on June 23, 2024.



44.    Law enforcement stationed on the building's pool deck observed JENKINS walk out onto the balcony and went back into the apartment.  Upon observing the officers, JENKINS went back into the apartment.

45.     USMS sent a remote-controlled drone into the apartment to get a visual of JENKINS' location inside the apartment.  USMS ultimately entered the apartment and arrested JENKINS, who had emerged from a bedroom, in the entry hallway.

## RECOVERY OF THE TARGET DEVICES

46.     Immediately following the arrest of JENKINS, USMS conducted a secondary security sweep of the apartment unit.  The apartment's kitchen and living room have an open floor plan and directly adjoin the hallway in which JENKINS was arrested.  TARGET DEVICE–1 was observed in plain view on a shelf above the stove in the apartment's kitchen, and TARGET DEVICE–2 was observed in plain view on the sofa in the apartment's living room.  USMS did not observe either of the TARGET DEVICES when the apartment was initially searched for JENKINS earlier in the day.

## CURRENT PROCEDURAL POSTURE

47.     As set forth above, on February 29, 2024, a Federal grand jury returned a one-count indictment charging JENKINS with unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1), for the firearm that was recovered on February 2, 2024.  *See United States v. Jenkins*, No. 24-CR-107 (DLF) (D.D.C.).  On July 3, 2024, JENKINS was arrested, as set forth above.  On July 5, 2024, JENKINS made his initial appearance.  JENKINS is held without bond.

48.     On July 30, 2024, a Federal grand jury returned a six-count superseding indictment charging JENKINS with two counts of carjacking, in violation of 18 U.S.C. § 2119(1); two related counts of using, carrying, possessing, and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and two counts of unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding

16

one year, in violation of 18 U.S.C. § 922(g)(1).   The charges arise out of the August 25, 2023, and January 26, 2024, armed carjackings, and JENKINS' August 26, 2023, and February 2, 2024, arrests.   The Honorable Dabney L. Friedrich, to whom the case is assigned, has scheduled an arraignment and status conference for August 8, 2024.

## BACKGROUND ON CELLULAR DEVICES

49.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that criminals and/or conspirators and individuals use cellphones, other electronic devices, electronic mail ("email"), and social media to conduct their illegal activity, to preserve and distribute photographs and videos in order to memorialize previous illegal activity, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals.

50.     There is probable cause that further evidence of the TARGET OFFENSES will be found following a forensic search of the TARGET DEVICES, including but not limited to communications between the subjects and co-conspirators, collaborators, and facilitators of the commission of the TARGET OFFENSES.   Based on my training and experience, I know that witnesses and perpetrators of crime in Washington, D.C., often communicate between and among themselves before, during, and after the crime.   They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc.   In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime.

### TECHNICAL TERMS

51.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

i.      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

ii.     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, DVDs, USB flash drives, flash memory cards, and internal and external hard drives.

iii.    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing

18

units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "Wi-Fi" networks.   When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.   These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, email, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing GPS locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touchscreen.   Like wireless phones,

19

tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "Wi-Fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and they may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include

programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

       g.     Internet Protocol (IP) Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers,

including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line (DSL), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a username or screen name, an email address, an email mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.     A "router" often serves as a wireless Internet access point for a single or multiple devices and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.     "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters,

22

with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

     i.   When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

     ii.   Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

     o.   "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

     p.   "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with

the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

52.     Based on my training, experience, and research, I know that the TARGET DEVICES consist of an Apple iPhone cellphone running the Apple iOS operating system and an Amazon Fire tablet computer running the Fire OS operating system, which is an Android-based operating system. In addition to TARGET DEVICE–1's ability to send and receive telephone calls and text messages (i.e., SMS) and to function as a GPS navigation device, the TARGET DEVICES have capabilities that allow them to serve as digital cameras, portable media players, and email communications devices. The TARGET DEVICES have web browsers and allow users to access, post to, and send private messages via social media, such as Facebook and Instagram, via apps. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

53.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET DEVICES, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the things described in Attachment B will be found on the TARGET DEVICES, the items described above and in Attachments A-1 and A-2, for at least the following reasons:

a.     Based on my training and experience, I know that crimes carried out by more than one person often involve some amount of communication among those involved—before, during, and after the crime.  This may involve working out details of and preparing to carry out a premeditated crime, working together to cover up the crime afterwards, or simply arranging to meet up someplace where an unplanned crime would later occur.  Either way, I know from training and experience that a phone used by a participant in such criminal activity often contains evidence of communication among accomplices.  For instance, communication logs indicate who the account user was communicating with both immediately before and after the crime.  They communicate using text messaging, apps, social media, and calls via both typical phone calls and app-enabled calling methods, such as those available on Instagram.  In my training and experience, communications between suspects have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime.  Moreover, such communications

26

have also revealed consciousness of guilt and efforts to impede police investigation, such as threats sent to witnesses or victims after a crime.  Similarly, your affiant has seen multiple examples of suspects communicating after a crime via text (or other online chat functions) to discuss where incriminating items have been hidden, where and what the police are doing to investigate the crime, and whether any witnesses have implicated them. Similarly, they are often featured in photographs and/or video recordings together, which provide key evidence in demonstrating the nature of their relationship.  In addition, an examination of the account's contact list is often critical in establishing these relationships, as people who know each other typically have each other's information in their contact lists, and, outside celebrity accounts, people are unlikely to have complete strangers included in such lists.  Here, JENKINS is prohibited from possessing firearms by virtue of prior felony convictions.  There is therefore probable cause to believe that JENKINS acquired the firearms unlawfully, meaning he necessarily purchased them from or through someone he knows, which is typically done by phone or online.

b.      Based on my training and experience, I know that people who commit crimes in Washington, D.C., and the surrounding area often use their smartphones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity.  Furthermore, I know from my training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the cellphone user's location and activity during a particular period of time.

c.      Based on my training and experience, I know that people who possess firearms, drugs, unlawfully obtained money, and other contraband like to take pictures of themselves with such items to prove ownership or possession to their friends—sometimes called "trophy photos."  They will use a camera, cellphone with a camera, tablets with a camera and or personal computers to photograph and store photograph of firearms or themselves holding the firearms or otherwise engaging in criminal activity that they may be involved in.  They also often share these images or video recordings with associates using text messaging or other forms of communication on their cellphone such as chat features or video and photo sharing on online social networking services, such as Instagram.  These photographs, videos, and electronic communications are excellent evidence of illegal gun possession and trafficking.  Moreover, apps such as Instagram can be used for communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.  As discussed above, there is probable cause to believe that JENKINS repeatedly has acquired firearms unlawfully, meaning he necessarily purchased them from or through someone he knows, which is typically done by phone or online.

d.      Smartphones used by unlawful possessors of illegal firearms contain valuable information and evidence relating to those offenses.  Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, GPS data, and any other stored electronic data.  This information can, among other things: (i) reflect the preparation for, arrangement of, and commission of the trafficking of firearms; (ii) identify locations where individuals traveled

28

to before and after acquiring, transporting, or selling firearms; (iii) identify potential suppliers, customers, and distributors of firearms; (iv) identify meeting locations for potential firearms transactions; (v) document or contain evidence of the obtaining, secreting, transfer, expenditure, and/or concealment of firearms; and (vi) document or contain evidence of the purchase of items with the proceeds of such illegal activity.

e.    Individuals who engage in criminal activity, including firearms trafficking offenses, use smartphones to access websites to facilitate illegal activity and to communicate with co-conspirators and others about their criminal activity online; to store on digital devices documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators and others; email correspondence; text or other messages; contact information of co-conspirators and others, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and documentation of, or an accounting of, illegal proceeds.

f.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

g.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smartphone, or a memory card, the data

contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smartphone, or other digital device habits.

54.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET DEVICES at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device is, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the device, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, email programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smartphone, or other digital device was in use.  Computer, smartphone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and it also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.    A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic

programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

55.     Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement

laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format (PDF), do not lend themselves to keyword searches.  Some

34

applications for computers, smartphones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smartphones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running iOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cellphones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smartphones

inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

56.    In searching for information, records, or evidence, as further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.      The TARGET DEVICES, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid

of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.       The analysis of the contents of the TARGET DEVICES may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.       In searching the TARGET DEVICES, the forensic examiners may examine as much of the contents of the TARGET DEVICES as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the TARGET DEVICES will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH
## <u>THE TARGET DEVICES AT ANY TIME OF THE DAY OR NIGHT</u>

57.     Because the TARGET DEVICES are in the custody of ATF and forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search of the TARGET DEVICES at any time of the day or night.

## <u>CONCLUSION</u>

58.     Your affiant respectfully submits that this affidavit supports probable cause for a warrant to search the TARGET DEVICES, the items described above and in Attachments A-1 and A-2, for fruits, evidence, information relating to, contraband, or instrumentalities of the TARGET OFFENSES, the things described in Attachment B.  Your affiant respectfully requests that this Court issue the proposed search warrant under Federal Rule of Criminal Procedure 41.


Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by telephone.

_____
Darius J. Terry
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives


Subscribed and sworn pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3) by telephone on August 2, 2024.



_____
The Honorable Zia M. Faruqui
United States Magistrate Judge